# IN THE COURT OF APPEALS OF IOWA

No. 15-1895
Filed December 21, 2016

**STATE OF IOWA,**
     Plaintiff-Appellee,

**vs.**

**ARTHUR LAMAR BENSON,**
     Defendant-Appellant.

_____

Appeal from the Iowa District Court for Polk County, Jeffrey D. Farrell, Judge.

Arthur Benson appeals his convictions of first-degree burglary and nine counts of first-degree robbery. **AFFIRMED.**

Erin M. Carr of Carr & Wright, P.L.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Thomas Bakke and Kevin Cmelik, Assistant Attorneys General, for appellee.

Heard by Danilson, C.J., and Doyle and McDonald, JJ.

**DOYLE, Judge.**

Arthur Benson appeals his convictions of first-degree burglary and nine counts of first-degree robbery. He contends the trial court abused its discretion in permitting one of the investigating officers to testify as an expert witness regarding cell phone records. He also contends the evidence fails to corroborate the co-conspirator testimony offered at trial, and therefore, the evidence is insufficient evidence to support his convictions.

Our review shows the trial court acted within its discretion in allowing the expert witness testimony regarding the cell phone records. Furthermore, there is sufficient independent evidence to corroborate the accomplice testimony implicating Benson's involvement in the crimes for which he was convicted. Accordingly, we affirm.

**I. Background Facts and Proceedings.**

The State charged Benson and four others with crimes relating to their participation in a robbery. A joint trial for Benson and a co-defendant, Joseph Rendon, commenced in September 2015. The jury found both men guilty as charged. In affirming Rendon's convictions, this court summarized the facts of the crime as follows:

> On September 24, 2014, Thomas Dean hosted an illegal high-stakes poker game in an outbuilding at his home on 86th Street in Johnston. Rendon had previously attended a poker tournament at Dean's home and knew there would be a large amount of cash at the game. At about 1:30 a.m. on September 25, four men—Garvis Thompson, Arthur Benson, Jacari Benson (Jacari), and David Moore—came into the outbuilding. Three of the men carried guns, and the fourth had a bag. The intruders took money and cell phones from the people participating in the poker game. The intruders made the poker players lay on the floor, and

then ran out to their get-a-way vehicle, a Chevrolet Impala, driven by Benson's girlfriend, McKenzie McCracken.

One of the poker players, Justin Lisk, ran out, got into his pickup truck, and followed the Impala south on 86th Street. Lisk's cell phone had not been taken by the intruders, and he called 911 to inform officers of the intruders' location.[1] McCracken lost control of the Impala and it struck another vehicle. The occupants of the Impala abandoned it and fled on foot. Officers set up a perimeter in an attempt to capture the criminals. The only vehicle to come through the perimeter was a maroon SUV.

Officers found paperwork addressed to Moore in the Impala. Also, fingerprints from Thompson and Jacari were found on the door handles of the Impala and Thompson's DNA was found on a black ski mask. Officers picked up Thompson, Benson, Jacari, and Moore, and analyzed their cell phones. They found a pattern of calls between the men and with Rendon. The subscriber for Thompson's cell phone was Rendon. Video taken by a security camera on the corner of 86th Street and Meredith Avenue from the night in question showed the Impala, followed by Lisk's pickup, followed by a maroon SUV. On September 26, a maroon SUV, driven by Rendon, was stopped by State troopers and given a warning for speeding on eastbound Interstate 80.

Rendon [and Benson were] charged with burglary in the first degree and nine counts of robbery in the first degree . . . .

Moore accepted a proffer agreement from the State and testified at [the] trial. Moore testified he was Thompson's cousin and often went to Thompson's apartment. Moore stated Rendon told him and Thompson about the poker games and how it would be easy to take the money. He stated Rendon had the idea for the robbery and Thompson planned the details. Moore testified Rendon brought over gloves for the group and zip ties to use on the poker players.[2] Moore stated Rendon dropped him off at Dean's home, and Rendon was to drive around to make sure no one else was in the vicinity.

Thompson also entered into a proffer agreement with the State. Thompson testified Rendon supplied him with drugs and Thompson distributed the drugs to Benson and Jacari, who helped sell the drugs. Thompson stated Rendon came to him with the idea of robbing a poker game, and they discussed the idea with Moore, Benson, and Jacari. Thompson testified Rendon was supposed to drive behind the Impala to make sure no one was following them after the robbery. Thompson stated they obtained $17,000 in the robbery and Rendon received $8000 of that amount. The day after the robbery, Rendon drove Thompson to the Quad Cities in a maroon SUV. Thompson testified he and Rendon planned to use the money obtained in the robbery to purchase more drugs, which they would then sell.

. . . .

Detective Tyler Tompkins of the Johnston Police Department testified he had taken several classes on analyzing cell phones and cell phone records. Detective Tompkins testified the cell phone records showed Rendon, Thompson, Moore, and Jacari were often in contact with each other before the robbery and after the robbery. According to the records, the cell phone towers used for the calls were consistent with the testimony of Thompson, Moore, and Jacari about their activities on September 24 and 25, as well as Rendon and Thompson's drive to the Quad Cities on September 26.

---

[1] During the poker game, Lisk placed his cell phone on a shelf in the outbuilding and it was not taken by the intruders. Lisk grabbed his cell phone as he ran out to follow the intruders.

[2] Thompson also testified Rendon provided zip ties to use on the poker players. The intruders, Thompson, Benson, Jacari, and Moore, did not use the zip ties. Moore, who brought the zip ties to the robbery, testified he became too nervous and did not get them out.

*State v. Rendon*, No. 15-1832, 2016 WL 6270092, at *1-2 (Iowa Ct. Oct. 26, 2016).

After the State presented its case-in-chief at trial, Benson moved for judgment of acquittal, arguing there was insufficient evidence to corroborate the accomplices' testimony. The court denied the motion, and the jury found Benson guilty as charged. The court also denied Benson's motion in arrest of judgment and motion for new trial before sentencing Benson to prison.

Benson appeals,[1] making two claims: (1) the trial court abused its discretion in allowing Detective Tompkins to testify as an expert witness

---

[1] Aaugh! In over sixty opinions filed in the last eight years we have noted an all-too-frequent error in compiling the appendix: the failure to place a witness's name at the top of each appendix page where the witness's testimony appears. *See* Iowa R. App. P. 6.905(7)(c) ("The name of each witness whose testimony is included in the appendix *shall* be inserted on the top of each appendix page where the witness's testimony appears." (emphasis added)). Wearily, we make the same observation of the parties' appendix in this case. Having the name at the top of each page makes it much easier for us to navigate an appendix, particularly when filed in electronic form. Additionally, omissions of transcript pages were not indicated by a set of three asterisks. *See* Iowa R. App. P. 6.905(7)(e). Furthermore, the exhibits included in the appendix were not

regarding the cell phone tower records and (2) there is insufficient evidence to corroborate the accomplice testimony.

## II. Expert Witness Testimony.

We review the admissibility of expert witness testimony for an abuse of discretion. *See State v. Hicks*, 791 N.W.2d 89, 98 (Iowa 2010). This includes determinations regarding whether a witness has sufficient expertise to express an opinion on a matter of specialized knowledge. *See State v. Ogg*, 243 N.W.2d 620, 621-22 (Iowa 1976); *State v. Walker*, 236 N.W.2d 292, 296 (Iowa 1975). We will not overturn the trial court's ruling unless it exercised its discretion on clearly untenable grounds or to a clearly unreasonable extent. *See State v. Rodriquez*, 636 N.W.2d 234, 245 (Iowa 2001).

Traditionally, Iowa has taken a liberal view regarding the admission of expert opinion evidence. *See State v. Tyler*, 867 N.W.2d 136, 153 (Iowa 2015); *Leaf v. Goodyear Tire & Rubber Co.*, 590 N.W.2d 525, 532 (Iowa 1999) (citing court's history of maintaining liberal view on admissibility). The question is whether the testimony will assist the jury in deciding an issue. *See State v. Schutz*, 579 N.W.2d 317, 319 (Iowa 1998). Benson concedes there "is no dispute" that cell phone tower records can be used to approximate a person's location based on the location and that expert testimony regarding cell phone tower records would be useful in assisting the jury to interpret the cell phone

concisely described in the table of contents. *See* Iowa R. App. P. 6.905(4)(c). By this note, we do not single out these parties or their attorneys, for we have made similar observations in numerous appeals. Our comment is directed to the appellate bar in general. While the noted infractions may seem trivial, the violated rules are not just some rigmarole designed to create more work for the appellate lawyer. Compliance with the rules saves time, reduces frustration, and assists this court in meeting its mandate to achieve maximum productivity in deciding a high volume of appeals. *See* Iowa Ct. R. 21.11.

tower records. He instead challenges the officer's qualifications to interpret the records for the jury.

Because unreliable evidence cannot assist the jury, the court must make a threshold determination regarding a witness's reliability as an expert. *See id.* Iowa Rule of Evidence 5.702 states a witness may be qualified as an expert "by knowledge, skill, experience, training, or education." Although witnesses must be qualified in the area of their testimony based on one of these five areas of qualification, there is no particular degree, license, or education required for witnesses to be considered experts. *See Quad City Bank & Trust v. Jim Kircher & Assocs., P.C.*, 804 N.W.2d 83, 92 (Iowa 2011). The question before us is whether the officer's knowledge, skill, experience, training, or education provided him with the requisite experience to opine on the question of Benson's location based on the cell phone tower records.

In *Rendon*, we determined the trial court acted within its discretion in admitting Detective Tompkins's testimony as an expert witness with regard to the cell phone records because "Detective Tompkins had sufficient knowledge, skill, experience, and training to interpret the cell phone records and to assist the jury in understanding those records." *See Rendon*, 2016 WL 6270092, at *4. Benson complains that Detective Tompkins "was unable to articulate when a cell tower would get overloaded and be forced to relay calls to a different tower" and that he was "unfamiliar and untrained on the current 4G technology or how the new technology would affect cell tower communication even though that was the purpose of his offered testimony." As we stated in *Rendon*, the complaint that Detective Tompkins did not have "up-to-date technical knowledge" goes to the

weight of the evidence, not its admissibility. *See id.*; *see also Schutz*, 579 N.W.2d at 319 (noting the degree of certainty expressed by the expert goes to the weight of the testimony rather than its admissibility).

Because Detective Tompkins possessed sufficient knowledge and training to assist the jury in interpreting the cell phone records, the trial court was within its discretion to allow Detective Tompkins to testify as an expert.[2]

### III. Sufficiency of the Evidence.

Benson also argues the trial court erred in denying his motions for judgment of acquittal and new trial because the State failed to present sufficient evidence to corroborate the testimony of the accomplices. Although Rendon concedes there is "no question" his accomplices' testimony implicated him in the robbery, he argues there is little other evidence to connect him to the crimes.

The existence of corroborating evidence is a legal question for the court. If the evidence is legally adequate to corroborate the accomplice testimony, the question of sufficiency of that evidence is for the jury to decide. *See State v. Hutchinson*, 341 N.W.2d 33, 37 (Iowa 1983). Because Benson is challenging the court's determination that sufficient corroborating evidence existed to submit the case to the jury, our review is for correction of errors at law. *See State v. Bugley*, 562 N.W.2d 173, 176 (Iowa 1997). We view the evidence in the light most favorable to the State and indulge every legitimate inference that may be made from it in favor of the State. *See id.*

---

[2] We note that another court suggests "the better approach is to require the prosecution to offer expert testimony to explain the functions of cell phone towers, derivative tracking, and the techniques of locating and/or plotting the origins of cell phone calls using cell phone records." *Wilder v. State*, 991 A.2d 172, 198 (Md. Ct. Spec. App. 2010).

Iowa Rule of Criminal Procedure 2.21(3) states that a defendant may not be convicted on the testimony of an accomplice "unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense." We note that to corroborate accomplice testimony, the evidence must show more than just the commission of the offense or the circumstances therefore. *See* Iowa R. Crim. P. 2.21(3). The testimony of one accomplice cannot corroborate the testimony of another accomplice. *See State v. Barnes*, 791 N.W.2d 817, 824 (Iowa 2010). In a joint trial, accomplice testimony must be corroborated as to each defendant. *See State v Brown*, 397 N.W.2d 689, 695 (Iowa 1986).

We also note that corroborating evidence need not be direct; circumstantial evidence is sufficient to corroborate accomplice testimony. *See id.* Corroborating evidence does not need to be strong or confirm every material fact to which the accomplice testifies. *See id.* Nor is it required to be inconsistent with the defendant's innocence. *See id.* As long as the accomplice's testimony is corroborated in some material fact tending to connect the defendant with the commission of the crime, it is sufficient. *See State v. Ware*, 338 N.W.2d 707, 710 (Iowa 1983).

Based on accomplice testimony, the jury could surmise Benson received $2200 for his role in the robbery. A photo from Benson's Facebook page shows that on September 25, 2014, Benson added $2000 to a prepaid credit card. Furthermore, Benson's cell phone records corroborate his accomplice's claims regarding his location on the night of the robbery and that he turned his phone off

at the time the robbery was committed—an uncharacteristic act, according to Benson's cell phone records.

There is sufficient independent evidence to corroborate the accomplice testimony implicating Benson's involvement in the crimes for which he was convicted. Accordingly, the trial court did not err in denying Benson's motion for judgment of acquittal or motion in arrest of judgment.

**AFFIRMED.**